**In the Matter of the Request for EXTRADITION OF Peter Gabriel John McMULLEN by the Government of the United Kingdom of Great Britain and Northern Ireland.**

No. 90 Civ. 5901 (RJW).

United States District Court,
S.D. New York.

July 17, 1991.

Leonard F. Joy, The Legal Aid Soc., Federal Defender Services Unit (Ian Weinstein, of counsel), and Arnold & Porter (Michael D. Schissel, of counsel), New York City, for petitioner.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Timothy MacFall, of counsel), New York City, for respondent.

## OPINION

ROBERT J. WARD, District Judge.

Peter Gabriel John McMullen ("McMullen") has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. §§ 1651 and 2241. McMullen claims that the Government's attempt to extradite him pursuant to the Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, 28 U.S.T. 227, T.I.A.S. No. 8468 (effective Jan. 21, 1977) (the "1977 Treaty"), and the Supplementary Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland (effective December 23, 1986) (the "Supplementary Treaty"), violates his constitutional rights. For the reasons that follow, the petition is granted.

## BACKGROUND

In the instant case, the Court is required to decide whether the Government constitutionally may attempt to extradite McMullen under an amended extradition treaty which removes a defense to extradition successfully asserted by him in a previous extradition proceeding brought pursuant to the prior treaty. The case, which presents several constitutional issues of first impression, comes to the Court in an unusual procedural posture.

Since December 1986, McMullen has been detained pending a hearing on a request for his extradition by the Government of the United Kingdom of Great Britain and Northern Ireland (the "United Kingdom"). The Request for Extradition was originally assigned to this Court. By Order dated February 11, 1987, the Request for Extradition of McMullen was referred for all further proceedings to Magistrate Judge Kathleen Anne Roberts, in accordance with 18 U.S.C. § 3184.

On March 6, 1989, McMullen moved before Magistrate Judge Roberts to dismiss the extradition request on constitutional grounds. The motion was fully and extensively briefed by the parties. Neither party raised the question of the Magistrate Judge's jurisdiction to rule upon the constitutional questions presented by McMullen's motion. However, Magistrate Judge Roberts then raised the issue of her jurisdiction, *sua sponte*, and requested submissions from the parties.

After a review of the applicable case law, petitioner determined that the Magistrate Judge did not have jurisdiction to decide the issues raised in his motion to dismiss. He then brought the instant petition for habeas corpus, arguing that this Court should hear the case, although the extradition hearing has not yet occurred, because of the unusual circumstances. Following a conference before the Court, the parties stipulated that this Court would decide the issues raised in the petition, in order to promote a timely resolution of the case. The Court agreed that such was an appropriate course in light of the unusual circumstances,[1] and "So Ordered" the stipulation on October 25, 1990.[2]

1. Courts have heard applications for writs of habeas corpus prior to the extradition hearing in unusual circumstances. *See Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *Ivancevic v. Artukovic,* 211 F.2d 565 (9th Cir.), cert. denied, 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 645 (1954); *Jhirad v. Ferrandina,* 355 F.Supp. 1155 (S.D.N.Y.), *rev'd on other grounds,* 486 F.2d 442 (2d Cir.1973). Because resolution of the instant issues might affect which treaty should apply at McMullen's extradition proceeding, the

Court finds that this case presents such unusual and compelling circumstances.

2. The parties further agreed that this Court would consult with Magistrate Judge Roberts in considering the issues raised in the petition, as she had spent a considerable amount of time evaluating McMullen's motion prior to determining that she lacked jurisdiction to decide the constitutional issues presented. In this regard, the Court wishes to acknowledge the thorough and thoughtful input of Magistrate Judge Rob-

McMullen entered this country illegally in early 1978, using a false identity and passport. He claims to have done so in order to escape a death sentence levied upon him by the Provisional Irish Republican Army (the "PIRA"), of which he had previously been a member but then had resigned based upon his disagreement with its leaders. Once in the United States, McMullen contacted agents from the Bureau of Alcohol, Tobacco and Firearms (the "BATF") with the goal of attempting to legalize his status in exchange for information on IRA activities in the U.S. and abroad. In July 1978, after a series of negotiations with agents from the BATF as well as the FBI and New Scotland Yard ("NSY"), McMullen was informed that he would not be granted asylum and thereafter the United States filed an extradition request on behalf of the United Kingdom.[3]

On May 11, 1979, the Honorable Frederick J. Woelflen, a United States Magistrate in the Northern District of California, denied the Government's request to extradite McMullen to Great Britain. After holding a hearing, Magistrate Woelflen determined that McMullen's alleged offense was encompassed by the "political offense exception" set forth in Article V(1)(c)(i) of the 1977 Treaty.[4] In his decision, the Magistrate found that McMullen "ha[d] established by evidence, which we most [sic] conclude as preponderating that the act of bombing the Claro Barracks was political in character," and that an uprising of a political nature existed in Northern Ireland at the time of the bombings. Accordingly the Magistrate held that McMullen was not extraditable under the provisions of the

extradition treaty then in force between the United States and the United Kingdom.

Following the denial of the original extradition request, an attempt was made to deport McMullen to the Republic of Ireland. McMullen conceded deportability, but requested political assylum in the United States or withholding of deportation to the Republic of Ireland. After several years of litigation, see Matter of McMullen, Interim Decision 2831 (B.I.A.1980); McMullen v. INS, 658 F.2d 1312 (9th Cir. 1981), these requests were ultimately denied and a final order of deportation was upheld by the Court of Appeals for the Ninth Circuit in August 1986. McMullen v. INS, 788 F.2d 591 (9th Cir.1986). McMullen was taken into custody on December 16, 1986, and was transported to New York on December 23, 1986 for deportation to the Republic of Ireland.

That same day, December 23, 1986, the Supplementary Treaty went into effect. That treaty, under which McMullen's extradition is now being sought, eliminates for the most part the "political offense exception" contained in the 1977 Treaty, under which McMullen had successfully defended against the previous extradition request. Article 1 of the Supplementary Treaty provides, in relevant part, that:

... none of the following offenses shall be regarded as an offense of a political character:

. . . . .

(b) murder, voluntary manslaughter, and assault causing grievous bodily harm;

. . . . .

(d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or

erts, which was extremely helpful in disposing of the instant petition.

3. McMullen is the subject of a warrant of arrest issued by a British justice of the peace on June 20, 1978, charging him with the crime of attempted murder (two counts); damaging property (two counts); using explosives with intent to cause grievous bodily harm; and placing explosives against a building with intent to cause grievous bodily harm, in connection with several bombings that took place on March 26, 1974 at Claro Barracks, Ripon, County of North Yorkshire. During an interview with agents

from NSY, McMullen incriminated himself in the Claro Barracks bombings, the basis for the extradition requests against him. McMullen argues that his statements were coerced by the Government without a valid waiver of rights, in violation of the due process clause of the fifth amendment.

4. That clause provided:
(1) Extradition shall not be granted if:
(c)(1) the offense for which extradition is requested is regarded by the requested Party as one of a political character....

parcel bomb, or any incendiary device if this use endangers any person;

(e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense.[5]

On December 24, 1986, McMullen was in the process of being deported to the Republic of Ireland when he was arrested in New York City pursuant to a provisional warrant of arrest for extradition under the Supplementary Treaty, issued by the Honorable Peter K. Leisure. The United States Attorney's Office for the Southern District of New York, acting on behalf of the United Kingdom, filed a formal request for McMullen's extradition on February 11, 1987. McMullen has been detained without bail since his arrest on December 24, 1986.

## DISCUSSION

McMullen argues that the extradition proceeding pending against him violates the Constitution in several respects. First, he argues that application to him of the Supplementary Treaty offends the constitutional prohibition against bills of attainder. Second, McMullen contends that its application to him also violates the *ex post facto* clause. Third, McMullen asserts that the Supplementary Treaty violates the separation of powers doctrine. Finally, according to McMullen the totality of the Government's actions in this case offend the due process clause of the fifth amendment. The Court will address these arguments in turn.

I. *The Prohibition Against Bills of Attainder.*

■ The Supreme Court has defined a bill of attainder[6] as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977). Historically, a bill of attainder was a parliamentary act sentencing to death a specific person or persons who had attempted to overthrow the government. *See United States v. Brown,* 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965). Bills of pains and penalties were indentical in form to bills of attainder, but prescribed penalties short of death. *See id.; Linnas v. INS,* 790 F.2d 1024, 1028 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). It is well-settled that the constitutional prohibition applies to legislative enactments carrying either degree of punishment. *E.g., id.* at 1028 (citing *United States v. Brown, supra,* 381 U.S. at 441, 85 S.Ct. at 1711; *United States v. Lovett,* 328 U.S. 303, 315, 66 S.Ct. 1073, 1078, 90 L.Ed. 1252 (1946); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866)). *See also, Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984).

It has been noted that "[b]ills of attainder have historically been passed in times of rebellion," and that "[t]he temptation to utilize bills of attainder is especially strong when national security is thought to be threatened." *Linnas v. INS, supra,* 790 F.2d at 1028 (citations omitted).

> The use of bills of attainder and bills of pains and penalties was not limited to England. During the American Revolution, the legislatures of all thirteen states passed statutes directed against the Tories; among these statutes were a large number of bills of attainder and bills of pains and penalties.

**5.** Article 5 of the Supplementary Treaty provides:

This Supplementary Treaty shall apply to any offense committed before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before this Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

**6.** U.S. Const. art. I, § 9, cl. 3 provides: "No bill of attainder or *ex post facto* law shall be passed." U.S. Const. art. I, § 10, cl. 1 provides: "No State shall ... pass any bill of attainder [or] *ex post facto* law...." These provisions "were adopted by the Constitutional Convention unanimously, and without debate." *United States v. Brown,* 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965).

*United States v. Brown, supra*, 381 U.S. at 442, 85 S.Ct. at 1711. Following the Civil War, the Supreme Court invalidated state and federal laws which sought to punish Confederate sympathizers, *see Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867), and later the Supreme Court invalidated a Congressional appropriations measure designed to bar "subversives" from government service, *see United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946).

The bill of attainder clause was regarded by the Framers as a particular bulwark against legislative overreaching and as part of the general implementation of the doctrine of separation of powers. It "reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." *United States v. Brown, supra*, 381 U.S. at 445, 85 S.Ct. at 1713. The historical evidence suggests that the clause:

> was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature.

*Id.* at 442, 85 S.Ct. at 1711.

■■■ In order to operate as a bill of attainder, a legislative enactment must satisfy "three requirements, *i.e.*, specification of the affected persons, punishment, and lack of a judicial trial." *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847, 104 S.Ct. 3348, 3352, 82 L.Ed.2d 632 (1984). McMullen argues that the Supplementary Treaty

operates as an unconstitutional bill of attainder in that the Executive and the Senate [7] specifically targeted him and two other suspected Irish Republican Army members, explicitly attempting to overrule judicial determinations favorable to them regarding the political offense exception contained in the 1977 Treaty. He contends that the legislation was motivated by a punitive goal, as evidenced by the reprinting of Magistrate Woelflen's decision in his case in the Congressional Record, Senator Lugar's remarks during the hearings on the Supplemental Treaty, the inclusion of a retroactivity clause (Article 5 of the Supplementary Treaty), and the virtual elimination of the political offense exception. Finally, McMullen asserts that this legislative punishment has been inflicted upon him without the benefit of a judicial trial.

McMullen first contends that the Supplementary Treaty singles him out for punishment. He notes that his name was specifically mentioned in the debate leading up to the Senate vote, particularly by Senator Lugar, the Chairman of the Foreign Relations Committee and sponsor of the Supplementary Treaty. Further, McMullen points out that following Senator Lugar's comments, the judicial opinion denying the 1979 extradition request against him was reprinted in full in the Congressional Record. The Government concedes that the Senate was aware that McMullen had avoided extradition by means of the political offense exception to the 1977 Treaty, but insists that the Supplementary Treaty was not "targeted at specific individuals," but rather that it is "one of the first in a new generation of extradition treaties" designed to eradicate global terrorism. While the Government acknowledges that the change in the treaty affects McMullen, it argues that the change was not motivat-

---

**7.** Although not raised by either party, the Court notes that treaties are entered into not in the traditional bicameral legislative mode, but by the Executive with the ratification of the Senate. Accordingly, there may be some question whether the Supplementary Treaty is "legislation" within the contemplation of the bill of attainder clause. However, in the Court's view a treaty which targeted specific individuals for punishment would pose the precise dangers against which the clause is intended to guard, and thus it is appropriate to hold that the bill of attainder clause equally would apply to invalidate such a treaty. *Cf.* L. Tribe, Constitutional Law, § 10–6 at 499—501 (arguing that bill of attainder clause applies to administrative and executive action inasmuch as the clause targets trial by legislative *method*, not trial by a particular legislative *body*).

ed by a desire to single him out for punishment.

A review of the Congressional Record bears out McMullen's characterization of the Supplementary Treaty as unusually *ad hominem.* *See* 132 Cong.Rec. 16,557–16,588, 16,592–16,611 (1986). For instance, in presenting the background for the Supplementary Treaty, Senator Lugar noted "[g]enerally speaking, what constitutes an offense of a political character has been left for the courts to define.... In three cases where the test has been applied, the Federal courts have denied requests by the United Kingdom for the extradition of members of the Provisional Irish Republican Army accused of committing acts of violence. Matter of Mackin; Matter of Doherty; and In re McMullen. In a fourth, a petition for certiorari, which seeks to overturn a finding of extraditability, was filed by the defendant on July 2. Quinn versus Robinson." *Id.* at 16,558. The four judicial opinions, including Magistrate Woelflen's opinion finding McMullen's alleged offense was political and therefore not extraditable, are reprinted in full. *Id.* at 16558–86.

Senator Lugar then stated: "Mr. President, it was because of these cases that on June 25, 1985, the United States and the United Kingdom signed the Supplementary Extradition [sic]. *Its purpose is to reverse the three cases where extradition was denied and put an end to this development in the law.*" *Id.* at 16,586 (emphasis supplied). According to Senator Lugar, the "principal focus" of the Senate Foreign Relations Committee's year-long deliberations on the Supplementary Treaty was Article 1 of the 1977 Treaty, which excepted from extradition those whose offenses were of a "political character." The provision was changed to limit the exception's applicability so that "individuals sought for extradition to the United Kingdom would have no longer been able to interpose a defense based on political considerations at their extradition hearing. Their only recourse would have been to appeal to the Secretary of State to exercise his discretion to deny the extradition request notwith-

standing a court ruling." *Id.* Senator Lugar reported that all committee members "were critical of these [three IRA] cases. No member supports the political offense exception as a shield to protect terrorists." *Id.* However, according to Senator Lugar, because the political offense exception was deeply engrained in American jurisprudence, to abandon it altogether because of "a few unfortunate cases struck several members as an extreme solution." *Id.* The committee thus fashioned a compromise: "In effect, those who commit serious acts of violence, or attempt to commit, or participate as an accomplice in these acts, can no longer escape extradition by claiming their offenses were political. Thus, in each of the four cases I described earlier, *had the supplementary treaty been in effect the political offense would, without question, have been decided against the defendant.*" *Id.* at 16,587 (emphasis supplied).

Senator Lugar also stated that the committee had considered at length the issue of retroactivity. *Id.* Senator Pell agreed, noting that the treaty issue

has been contentious and divisive because it presented the committee with the apparently irreconcilable choices—to make it easier for Britain to bring fugitive terrorists to justice or to preserve the American tradition of barring extradition if a judicial determination has been made that the offense involved is political in nature.

Extradition can be a potent weapon in the war against terrorism, and make no mistake about it—it is a war. At the same time, it is a very major step to abandon more than a century of law and practice regarding the political exception to extradition. Our country refused to enter into extradition treaties at all for the first 50 years or so of our existence, because we harbored a great distrust of foreign legal systems. When we did enter into extradition treaties, it was on the condition that political offenses would be excluded and that U.S. courts would decide what constituted a political offense. This approach was grounded in the belief that rebels and political dissidents should

not be turned over for trial to the very government they opposed.

All of the more than 100 extradition treaties that the United States has concluded have included a provision excluding political offenses—and that includes the treaty that has been in force with the United Kingdom since 1977. *Last year, concerned about the denial by U.S. courts of British extradition requests in three cases involving members of the Provisional Irish Republican Army, the administration submitted to the Senate a supplementary treaty.* The supplementary treaty, as submitted, would have eliminated the political exception for acts of violence, and with it, the traditional role of U.S. courts to deny extradition in connection with alleged political offenses. That struck many on the committee as a remedy disproportionate to the problem at hand. There was broad agreement that the current treaty must be strengthened in order better to combat terrorism; but there was also considerable concern about the extent to which it would be prudent to depart from over a century of law and practice on the political exception.

*Id.* at 16,588 (emphasis supplied).[8]

In a crucial exchange, Senator D'Amato then proposed an amendment which would have limited the applicability of the retroactivity clause of the Supplementary Treaty to those individuals whose extradition had never been sought prior to the effective date of the Supplementary Treaty. *Id.* at 16,592. He noted that "[a]lthough most supplementary extradition treaties are retroactive, few specifically state that crimes committed before or after enactment are retroactively covered. No other treaty retroactively changes the political offense exception." *Id.* Senator D'Amato stated

that "[a]pproving this treaty in its present form may well result in the extradition of certain individuals who American courts have refused to extradite after the most careful consideration. Such a result would be similar to the enactment of a bill of attainder or an ex post facto law in violation of the principle contained in article I, section 9, clause 3 of our Constitution...." *Id.*[9]

Senator Lugar responded to Senator D'Amato's proposal by commenting that: "In trying to make a case of ex post facto law or of retroactivity, the assumption, I suspect, on the part of the proposers of this amendment or others ... is that, somehow or other, we are imposing extraordinary penalties or new penalties or augmenting the hazard for the individual. As a matter of fact, the acts have been committed and the fugitives are in one place, and the hope of a country is that they might be somewhere else so that they might face the consequences...." *Id.* at 16,593. Senator D'Amato responded:

It seems to me that [violating established principles of law] is a very dear price for us to pay and for our ally to say we seek good faith by turning over the well-established principles of law to go back so that we may retry this person who is literally given the protection of the court under the existing laws so that we are going to change these laws and now apply them in an ex post facto fashion.

*Id.* at 16,594. Senator D'Amato ended his remarks by noting that "the rule of law that exists today as it relates to people who have had their day in court, have been tried, who, in essence, have been acquitted, should be continued, where it has been ruled that they should not be extradited." *Id.*

---

8. The compromise that was therefore struck was to include in the Supplementary Treaty Article 3(a), the "Ninoy Aquino clause," which would allow a court to deny extradition "based on a persuasive factual showing that trumped-up charges are involved or that the person sought could not get a fair trial because of his race, religion, nationality, or political opinions." *Id.* at 16,588; Supplementary Treaty, Article 3(a).

9. Senator D'Amato also declared that of the 100 bilateral extradition treaties to which the United States is a party, no other treaty contains such a narrow political offense exception. Several other recent extradition treaties, he noted, including those with Italy, the Republic of Ireland, and Jamaica, limit the political offense exception by excluding those crimes which violate international law. *Id.* at 16,593.

Finally, two other Senators voiced support for the limitation on retroactivity to those whose extradition had not been previously sought. Senator Dodd, in support of the D'Amato amendment, stated that "there is not a single instance that we have been able to find, nor has the Department of State been able to find, where an individual would have been subjected to a new trial under that particular provision. So this is a unique situation where we have an individual who could be tried again, the only such situation that I know of." *Id.* at 16,597. Senator Hatch also opined that the retroactivity clause, as applied to those individuals whose extradition had previously been sought and denied, raised a serious issue concerning "the violation of due process and complete disregard of fundamental fairness relating to the reinstitution of extradition proceedings against individuals who have already been subjected to an extradition proceeding." *Id.* at 16,598. Senator Lugar, in opposition to the D'Amato amendment, stated that its "effect ... would be to protect two individuals, who are admitted terrorists...." *Id.* at 16,595.

The Supplementary Treaty, with Article 5 intact, was ratified by the Senate on July 17, 1986, and became law on December 23, 1986.

Notwithstanding the Government's assertions to the contrary, the emphasized portions of the Congressional Record clearly single out McMullen as a target of the Supplementary Treaty. The avowed purpose of the Treaty was "to reverse the three cases in which extradition was denied," including McMullen's case. *Id.* at 16,586. Moreover, by rejecting the D'Amato amendment, which would have abrogated the Supplementary Treaty's retroactive application to McMullen and two other men, the Senate endorsed this purpose.[10]

Having found that the Supplementary Treaty singles out McMullen, the Court must next determine whether the law inflicts punishment without a judicial trial. It has been noted that "[t]he concept of punishment under the bill of attainder clause has always been a fairly broad one." L. Tribe, American Constitutional Law § 10–4 at 642 n. 9. In evaluating whether a particular legislative enactment constitutes punishment, the Supreme Court has applied three alternative tests—the historical test; the functional test; and the motivational test. *See Nixon v. Administrator of General Services, supra,* 433 U.S. at 475, 478, 97 S.Ct. at 2806, 2809.

The historical test asks whether the law imposes a punishment "traditionally judged to be prohibited by the Bill of Attainder Clause." *Id.* at 475, 97 S.Ct. at 2806. Included in the list of historical punishments are execution, imprisonment, banishment, punitive confiscation of property, and bars against participation in specified employments or vocations. *See id.* at 473–75, 97 S.Ct. at 2805–06. McMullen argues that the Supplementary Treaty satisfies the historical test because it has resulted in his lengthy incarceration and, McMullen insists, will result in his execution at the hands of the IRA if he is extradited to Great Britain.[11]

---

**10.** It is notable that the "political offense exception" has been successfully asserted in only three cases in the last 25 years—McMullen's case, *In re Mackin,* 668 F.2d 122 (2nd Cir.1981), and *In re Doherty,* 599 F.Supp. 270 (S.D.N.Y.1984), *dism'd,* 615 F.Supp. 755 (1985), *aff'd,* 786 F.2d 491 (2d Cir.1986). (The relator in *Quinn v. Robinson,* 783 F.2d 776 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986), cited by Senator Lugar as another example of an assertion of the defense, was extradited). *See* M.C. Bassiouni, International Extradition § 2–10 (1983). "In addition, the 'exception' is rarely used as a defense—in the last thirty years, there have been no more than some thirty reported cases having any bearing on the 'political offense exception,' while during this period of time there has been

an average of one hundred extradition cases per year raising a panoply of technical questions much more important to the administration of criminal justice...." *Id.* § 2–11.

The sparing use of the "political offense exception" as a defense to extradition, and the courts' even more sparing grant of nonextraditability under the defense, indicate that, in ratifying the Supplementary Treaty with the retroactivity clause intact, the Senate's agenda was primarily the extradition of three individuals.

**11.** According to McMullen, "[t]he IRA consider [sic] him a traitor and recognizes one punishment for that offense ... [t]heir reach into English prisons is well documented." Petitioner's Brief at 25.

**1288**

■ The Court disagrees that the likely extradition of McMullen under the Supplementary Treaty may be analogized to any of the historical forms of punishment imposed by bills of attainder. McMullen's incarceration during the pendency of these proceedings was not mandated by the challenged legislation, but is a burden imposed by the extradition process. With or without the Supplementary Treaty, the Government could have reinstituted extradition proceedings against McMullen, with the resulting burden of imprisonment pending the extradition hearing.[12] The possibility that he would not be protected from harm in British prisons is also not a goal or direct result of the Supplementary Treaty. Rather, the Court finds that the alleged punishment inflicted on McMullen by the Supplementary Treaty is so novel that it must be evaluated under the functional and motivational tests to determine whether the legislature has fashioned a new burden or deprivation "inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services, supra,* 433 U.S. at 475, 97 S.Ct. at 2806.

■ Under the functional test, the Court must examine whether the law, "viewed in terms of type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. at 2806–07. The Government, quoting Senator Pell, asserts that the purpose of the Supplementary Treaty is "to make it easier for Britain to bring fugitive terrorists to justice [and] to

preserve the American tradition of barring extradition if a judicial determination has been made that the offense is political in nature." 132 Cong.Rec. at 16,588. The Government contends that the Supplementary Treaty accomplishes these competing purposes by narrowing the political offense exception to exclude individuals who have committed violent crimes (Article 1), while allowing judicial scrutiny into the motives of the requesting party by permitting courts to deny extradition requests based on improper discrimination (Article 3). Clearly, another purpose of the Supplementary Treaty, expressed by Senator Lugar, was to reverse the judicial finding of nonextraditability in McMullen's case. Balanced against these purposes is the burden imposed on McMullen—the necessity of defending against a second extradition request without the benefit of the broader political offense exception defense that he had successfully asserted in opposition to the first extradition request, and almost certain extradition to the United Kingdom to stand trial on the charges against him.

In general, the Senate's stated goal of assisting Great Britain in bringing fugitive terrorists to justice is not unreasonable and may in fact be furthered by narrowing the "political offense exception" by eliminating it where certain categories of crimes are charged. However, it is necessary to look beyond the Supplementary Treaty as a whole to the specific manner in which it targets the petitioner in this case. While the elimination of the political offense ex-

---

12. Because they are not "'final decisions of a district court,'" extradition orders are not appealable. *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976) (citation omitted); *see In re of Mackin,* 668 F.2d 122 (2d Cir.1981). The recourse of an accused who has been certified extraditable is to bring a habeas corpus proceeding in district court; the recourse of the requesting party whose extradition request has been denied is to refile the request. *Id.* at 128. In *Collins v. Loisel,* 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923), the Court held that the fifth amendment's provision against double jeopardy did not bar the government from instituting a third extradition proceeding on the same charge, notwithstanding its initial unsuccessful efforts. Indeed, "[p]rotection against unjustifiable vexation and harassment incident to re-

peated arrests for the same alleged crime must be sought, not in constitutional limitations or treaty provisions, but in a high sense of responsibility on the part of public officials charged with duties in this connection." *Id.* at 430, 43 S.Ct. at 619; *see Hooker v. Klein,* 573 F.2d 1360, 1365 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). Thus, the government is free at any time, except where the statute of limitations has run, to seek a more favorable review of its extradition request on the same evidentiary facts. *But see In re Tafoya,* 572 F.Supp. 95, 98 (W.D.Tex.1983) ("I do not mean to suggest that we should permit the government ... to try out seriatim four magistrates, four retired judges and sixteen active judges. There has to be a point to say, 'Lay off, Macduff'").

ception appears to be perfectly constitutional in general, even where that elimination is retroactive, as applied to McMullen the Senate purposefully went beyond that generality to make certain that a particular individual would be extradited notwithstanding a prior judicial determination of nonextraditability. It is this aspect of the Supplementary Treaty upon which the Court must focus in determining whether it satisfies constitutional muster.

The purpose of this aspect of the Supplementary Treaty is clearly punitive. The law is designed to make punishable a small group of three persons whom the Government finds blameworthy because of their participation in IRA activities against the United Kingdom. In the Court's view, the burdens imposed upon McMullen by the Supplementary Treaty far outweigh any arguable nonpunitive goals that would be furthered by retroactive application to the three individuals who had previously successfully defended against extradition. Thus, these burdens operate as a punishment under the bill of attainder clause.

The motivational test for punishment leads to the same conclusion. Under the motivational test, a court must inquire "whether the legislative record evinces a congressional intent to punish." *Id.* at 478, 97 S.Ct. at 2808. While the Government is correct that extradition in almost any other context is not punitive, under these peculiar circumstances the Supplementary Treaty, along with the accompanying legislative record, reflect a desire to punish McMullen,[13] and to undo the judicial opinion which found his acts exempted as political in na-

ture. Based on the above-cited numerous references to McMullen, and the oft-repeated purpose of reversing the judicial decision in his earlier extradition proceeding, the Court concludes that this third test of punishment is also met. Accordingly, the Court finds that the Supplementary Treaty inflicts punishment on McMullen.

The Government asserts that any punishment arguably inflicted upon McMullen by the Supplementary Treaty would not be imposed without the benefit of meaningful judicial process. It points to Article 3(a) of the Supplementary Treaty, the so-called "Ninoy Aquino clause" which provides:

Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained, or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions.

In addition, the Government notes that the traditional role of the extradition judge or magistrate of determining whether there exists sufficient "evidence of criminality" is preserved by the Supplementary Treaty.

There is no doubt that a judicial role is preserved, and even in some ways increased,[14] by the provisions of the Supple-

---

**13.** It might be argued that the punitive motivation existed on the part of the United Kingdom, rather than the United States Government. However, if the latter acts at the behest of the former to accomplish its punitive goals, the Court is of the view that this punitive motivation may fairly be imputed to the United States.

**14.** The Supplementary Treaty forces the courts to abandon their traditional "rule of noninquiry," which presumes that countries with which the United States has entered into extradition treaties will treat those extradited under those treaties fairly. *See Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).

With this rule [of noninquiry], the court precludes the introduction of any evidence in-

tended to prove that the individual sought for extradition may receive an unfair trial in the requesting country or be subject to persecution because of his political beliefs. The rule reflects a policy decision by the judiciary that such an examination into foreign political systems is inappropriate for the judicial branch. Rather, such an examination is best left to the executive branch in its discretionary confirmation of judicial decisions in favor of extradition.

Note, "The Turning Point Approaches: The Political Offense Exception to Extradition," 24 San Diego L.Rev. 549, 556 (1987) (citations omitted).

Article 3 of the Supplementary Treaty, by requiring an extradition court to examine evidence that an individual would be treated un-

mentary Treaty. However, this observation does not answer the question whether the Supplementary Treaty's impact upon McMullen served to impose punishment without judicial trial. The particular burdens suffered by McMullen—the reversal of a prior finding of nonextraditability, the removal of a defense successfully asserted in a prior proceeding, and almost certain extradition to the United Kingdom—were put into place without a judicial trial. It seems apparent in the instant case "that Congress was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses." *Nixon v. Administrator of General Services, supra,* 433 U.S. at 479, 97 S.Ct. at 2808.

In sum, given that the legislature explicitly sought to undo the judicial opinion on which McMullen's nonextraditability rested, and to unravel the basis on which the extradition magistrate had relied, it seems fairly clear that the "punishment" the Supplementary Treaty imposes on McMullen— a second bite at the extradition apple by the Government, and this time no "political offense" exception by which McMullen can evade extradition—did occur without a trial, or any other due process safeguards. Thus, the third and final prong of the test for a bill of attainder has been satisfied.

Accordingly, the Supplementary Treaty was intended to, and facially does, punish McMullen for acts he is alleged to have committed in Great Britain in 1974. The Court finds that the Supplementary Treaty is an unconstitutional bill of attainder as applied to McMullen, because it singles him out for punishment, it imposes punishment on him, and does so without a judicial trial.

fairly by the requesting country on account of his or her race, religion, nationality, or political opinions, unravels the rule of noninquiry with respect to the United Kingdom. Without commenting on the wisdom of this approach, the Court notes that in effect the Supplementary Treaty turns more than 100 years of extradition law on its head, reversing the traditional roles of the political and judicial branches and placing the political offense determination in the hands of the political branches of government (which have expressed an intention to eliminate the exception on a country-by-country basis),

## II. *The Prohibition Against Ex Post Facto Laws.*

McMullen contends that the application to him of the Supplementary Treaty also violates the constitutional prohibition against *ex post facto* laws. For the following reasons, the Court disagrees.

Article I, § 9, cl. 3 of the Constitution provides: "No ... *ex post facto* law shall be passed." [15] The Supreme Court first interpreted the *ex post facto* clauses in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). The Court held that the clauses proscribed:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. There, the Court found that the Connecticut legislature did not violate the *ex post facto* clause by setting aside the decree of a probate court. In a concurring opinion, Justice Iredell declared that "the true construction of the prohibition extends to criminal, not to civil cases." *Id.* at 399 (concurring opinion of Iredell, J.).

 Notwithstanding Justice Iredell's pronouncement, the Court went on to invalidate the legislative infliction of certain civil disabilities on *ex post facto* grounds.

while forcing the judiciary to probe the internal political workings of requesting countries.

**15.** As noted in *Weaver v. Graham,* 450 U.S. 24, 28 n. 8, 101 S.Ct. 960, 964 n. 8, 67 L.Ed.2d 17 (1981), the Constitutional Convention members attached such significance to the *ex post facto* prohibition that they put it in the Constitution twice: U.S. Const. art. I, § 9, cl. 3 (prohibiting federal government from enacting *ex post facto* law) and U.S. Const. art. I, § 10, cl. 1 (prohibiting any state from enacting *ex post facto* law).

*See, e.g., Burgess v. Salmon,* 97 U.S. (7 Otto) 381, 24 L.Ed. 1104 (1878) (invalidating retroactive tax on the sale of tobacco); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867) (invalidating law aimed at Confederate sympathizers which required clergymen to take expurgatory oath in order to preach); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867) (invalidating law which required attorneys to take expurgatory oath in order to practice). *See generally,* L. Tribe, American Constitutional Law § 10–2 at 633–35. However, the Court's modern interpretation of the *ex post facto* clauses conforms to the *Calder* view that the prohibition applies only to criminal or penal measures that have a retroactive effect. *See, e.g., Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (termination of deported alien's old-age benefits was not punitive and did not violate *ex post facto* ban); *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) (law providing for the deportation of any alien who had been a member of the Communist Party at any time following his entry into the United States did not violate *ex post facto* clause, which "has no application to deportation"); *Johannessen v. United States,* 225 U.S. 227, 242, 32 S.Ct. 613, 617, 56 L.Ed. 1066 (1912) (law revoking citizenship of persons who had obtained citizenship through fraud or illegal conduct did not violate the *ex post facto* prohibition, which "is confined to laws respecting criminal punishment and has no application to retrospective legislation of any other description").

■■■ Typically, the retroactive laws that violate the *ex post facto* clause are statutes imposing harsher criminal penalties than the law in effect at the time of the offense. For example, in *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Court held that a Florida law which retrospectively reduced "good time" credits available to a prisoner violated the *ex post facto* clause. The law, enacted two years after the petitioner was convicted and sentenced, reduced his opportunity to shorten his prison term through good conduct. According to the Court, an *ex post facto* law

is one " 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' " *Id.* at 28, 101 S.Ct. at 964 (*quoting Cummings v. Missouri, supra,* 71 U.S. (4 Wall.) at 325–26). Because the new law made "more onerous the punishment for crimes committed before its enactment," it ran afoul of the prohibition against *ex post facto* laws. *Id.* 450 U.S. at 36, 101 S.Ct. at 968. *See also Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (invalidating on *ex post facto* grounds the application of revised sentencing guidelines, which increased presumptive sentences, to a defendant whose crimes occurred before the effective date of the new guidelines). *But see Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (rejecting *ex post facto* challenge to death penalty statute that replaced the earlier constitutionally invalid statute under which petitioner was sentenced to death; Court found the new statute to be "ameliorative," making it more difficult to impose the death penalty).

There is no question that McMullen's conduct "was criminal under the laws of both the United Kingdom and the United States at the time it was committed" and that therefore that the Supplementary Treaty does not criminalize conduct that was previously lawful. Thus, the relevant inquiry here is whether the Supplementary Treaty's retroactive elimination of the political offense exception, as it affects McMullen, constitutes an augmented punishment for *ex post facto* purposes. McMullen argues that the retroactive change in the law inflicts punishment upon him by depriving him of the substantive defense that he successfully asserted in the earlier extradition proceeding, "thereby rendering conduct which was protected by the political offense exception when done, now unprotected." Petitioner's Memorandum at 28–29. Moreover, he asserts that the change in the law has subjected him to the ordeal of relitigating his extradition, extended imprisonment in the United States, forced

transportation, and "the ongoing threat of torture and execution." *Id.* at 35.

■ The elimination of McMullen's defense to extradition—the alleged punishment—must be viewed in light of the cases construing punishment under the *ex post facto* clauses and the nature of an extradition proceeding. As noted above, the *ex post facto* clauses have been narrowly construed to apply only to retroactive criminal penalties. Moreover, the *ex post facto* ban does not apply to every change in law that "may work to the disadvantage of a defendant." *Dobbert v. Florida, supra,* 432 U.S. at 293, 97 S.Ct. at 2298. Laws which retroactively change the rules of criminal procedure, but do not alter the substantive rights of the defendant do not violate the *ex post facto* prohibition. *See, e.g., Dobbert v. Florida, supra,* 432 U.S. 282, 97 S.Ct. 2290.

■ In the civil context, although the consequences of a retroactive law may be severe for the affected individuals, the law has generally been considered nonpunitive for *ex post facto* purposes. For example, in *Galvan,* the Court upheld a law requiring the deportation of any alien who had been a member of the Communist Party at any time after entry into the United States, even where his membership terminated prior to the law's enactment and had not previously been illegal. The Court observed that " 'deportation is a drastic measure and at times the equivalent of banishment or exile' " and that its "intrinsic consequences" are "close to punishment for crime." *Galvan v. Press, supra,* 347 U.S. at 530, 531, 74 S.Ct. at 742 (quoting *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433). Yet the Court determined that its precedent required a finding that the clause had no application to deportation, which was historically a civil disability. *Id.* 347 U.S. at 531, 74 S.Ct. at 743. *Accord Harisiades v. Shaughnessy,* 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952); *Mahler v. Eby,* 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924). Similarly, the Court has held that retroactive laws that disqualify ex-convicts from practicing certain professions are nonpunitive and not violative of the *ex post facto* clauses. *See, e.g., De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (convicted felons excluded from employment as officers of waterfront union); *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (doctor barred from practicing medicine because of prior felony conviction).

Turning to the nature of extradition, the Second Circuit has termed it *"sui generis."* *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.1976). *See also Hooker v. Klein,* 573 F.2d 1360, 1367 (9th Cir.1978) ("an order of extraditability defies easy classification"). An extradition proceeding is not a trial of the guilt or innocence of the accused, but an inquiry into whether he should stand trial in another forum. *Id.* As one commentator has stated, "What is at issue ... is not punishability, but prosecutability." M.C. Bassiouni, International Extradition and World Public Order at 524 (1974) (hereinafter, "Bassiouni"). The role of the extradition magistrate "is to determine whether there is competent evidence to justify holding the accused to await trial." *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). That is, the inquiry focuses on whether there is probable cause to believe that an offense has been committed and that the accused committed it. Bassiouni at 509, 515. The accused may introduce evidence to show that his case falls within a prohibition contained within the applicable treaty, or to show that he is not the person sought, but he may not introduce evidence in defense to the merits of the charge. *Id.* at 523–24. *See also Hooker v. Klein, supra,* 573 F.2d at 1369 (admission of evidence proffered by accused left to discretion of the court). The magistrate's finding on extraditability is not a final judgment, but rather "it is truly an interlocutory order, more akin to a preliminary hearing on criminal charges." *Id.* at 1367.

■ While McMullen has certainly been subjected to severe burdens—including extreme mental and emotional distress, imprisonment, and forced transportation—the

severity of the burdens placed upon him is not dispositive of their punitive character for *ex post facto* purposes. *See Galvan v. Press, supra,* 347 U.S. at 531, 74 S.Ct. at 743. In the Court's view, the Supreme Court's narrow construction of punishment under the *ex post facto* clauses does not extend to the treatment McMullen has received, for the *ex post facto* prohibition is "confined to laws respecting criminal punishments and has no relation to retrospective legislation of any other description." *Johannessen v. United States, supra,* 225 U.S. at 242, 32 S.Ct. at 617. An extradition proceeding is not a criminal prosecution; accordingly, the deprivation of a successful defense to extradition is not criminal punishment. *Cf. Jhirad v. Ferrandina, supra,* 536 F.2d at 485 n. 9 ("Sixth Amendment's guarantee to a speedy trial, limited by its terms to criminal prosecutions, is inapplicable to international extradition proceedings"). Accordingly, the Court finds that the application to McMullen of the Supplementary Treaty does not violate the constitutional ban against *ex post facto* laws.

III. *Separation of Powers.*

McMullen contends that Article 1 of the Supplementary Treaty encroaches upon the role of the judicial branch by limiting the power of the courts to determine what constitutes a political offense, and therefore violates the separation of powers principle inherent in the Constitution. McMullen argues that, in initiating the Supplementary Treaty, the Executive branch sought unilaterally "to simply do away with 150 years of jurisprudence" after Congress had clearly rejected the elimination of the political offense exception by defeating repeated attempts at amending the extradition statute.[16] McMullen contends that, in addition to making an end-run around the bicameral process, the Executive branch, through the Supplementary Treaty, has also altered the exclusive jurisdiction of the federal courts to decide whether alleged criminal conduct may be deemed a political offense.

The Government points out that, as constitutionally required, the treaty was initiated by the Executive branch and ratified by the Senate, and preserves the proper role of the judiciary—a judge or magistrate judge must still assess whether there is sufficient evidence to certify the extradition warrant.

 The authority to enter into extradition treaties rests exclusively with the Executive branch by virtue of its power under U.S. Const. art. 2, § 2 cl. 2 to conduct foreign relations. M.C. Bassiouni, International Extradition, United States Law and Practice Ch. II at § 1–1 (1983). This authority is limited by the requirement that such treaties be submitted to the Senate for its "advice and consent" and by the authority of Congress to enact legislation to define the extradition procedures and any substantive requirements to be followed by the federal courts. *Id.* The role of the courts is to interpret extradition treaties in accordance with the applicable provisions of the Constitution. *Id.* at II § 1–2. *See Eain v. Wilkes,* 641 F.2d 504, 514 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

 Extradition Treaties are enforceable without the aid of implementing legislation and are incorporated into federal law. Bassiouni, Extradition at II § 4–6 (citing *Terlinden v. Ames,* 184 U.S. 270, 288, 22 S.Ct. 484, 491, 46 L.Ed. 534 (1902)). Thus, extradition treaties and federal legislation carry equal weight, and courts attempt to interpret the two to avoid conflict and inconsistencies. *Id.* at II § 4–7. Section 3184 regulates extradition procedures, subject to the provisions of the applicable treaty. It provides that the judge or magistrate judge shall certify the extradition warrant after a hearing if "he deems the

---

16. Congress made several unsuccessful attempts between 1981 and 1984 to amend the extradition statute, 18 U.S.C. § 3184, so as to eliminate or limit the political offense exception in all extradition treaties. The Government concedes that Congress was unwilling to modify the political offense exception across the board, but argues that the Senate and Executive branch specifically chose to modernize the extradition process on a treaty-by-treaty basis, a method that takes into account the judicial safeguards available in each individual country.

evidence [of criminalty] sufficient to sustain the charge *under the provisions of the proper treaty or convention.*" 18 U.S.C. § 3184 (emphasis supplied).

A court's authority to determine whether a given offense falls within the "political offense" exception exists only to the extent that the extradition treaty it is interpreting contains such a provision. Contrary to McMullen's suggestions, the authority is not conferred by a statute or by the Constitution. In *Mackin* and *Eain*, the treaties at issue provided that " 'Extradition shall not be granted ... When the Offense is regarded *by the requested Party* as one of a political character....' " *Eain v. Wilkes, supra,* 641 F.2d at 517 (quoting extradition treaty). In each case, the court found that the words "the requested Party" conferred jurisdiction on the judiciary, and not on the Executive, to decide the political offense question. *In re Mackin, supra,* 668 F.2d at 132–37; *Eain v. Wilkes, supra,* 641 F.2d at 513; *In re Doherty,* 599 F.Supp. 270 (S.D.N.Y.1984). In *Doherty,* the court noted: "The *Treaty* vests the determination of the limits of the political offense exception in the courts and therefore reflects a congressional judgment that the decision not be made on the basis of what may be the current view of any one political administration." *In re Doherty, supra,* 599 F.Supp. at 277 n. 6 (emphasis supplied). McMullen's argument that the courts' jurisdiction to determine the political offense exception derives from a source other than the applicable treaty is misplaced.

Whether or not to include a "political offense" exception in an extradition treaty is a policy judgment, which rests exclusively in the discretion of the Executive branch and the Senate. The Senate specifically endorsed the limitations on the "political offense" defense in the Supplementary Treaty and the wisdom of that judgment is not reviewable by the courts. The Supplementary Treaty does not divest the judiciary of its role, mandated by § 3184 and the Constitution, to interpret the Treaty's provisions. Thus, the Supplementary Treaty does not offend the constitutionally-based separation of powers doctrine.

## IV. *Due Process.*

McMullen cites three grounds in support of his claim that his due process rights have been violated, and contends that his extradition would therefore be unconstitutional. First, he asserts that the Government manipulated him and the judicial process by intentionally causing delay to gain a tactical advantage. Second, he claims that the Government deceived him by leading him to believe that if he cooperated with various law enforcement agencies he would be given political asylum in the United States. As part of the deception, the Government allegedly coerced a damaging statement from him, without a valid waiver of his *Miranda* rights. Finally, McMullen contends that the cumulative effect of the violations of the principles underlying bills of attainder, *ex post facto* laws, separation of powers, and the finality of judgments and repose constitutes a separate due process violation.

 In carrying out its treaty obligations, the United States government must conform its conduct to constitutional requirements. *Grin v. Shine,* 187 U.S. 181, 184, 23 S.Ct. 98, 100, 47 L.Ed. 130 (1902). *See In re Burt,* 737 F.2d 1477, 1485 (7th Cir.1984) ("when the conduct of the United States government is challenged, such conduct must be assessed in light of the Constitution"); *Plaster v. United States,* 720 F.2d 340, 348 (4th Cir.1983). Where an extradition court finds that extradition would violate the relator's constitutional rights, the Executive branch may not extradite him. *In re Burt, supra,* 737 F.2d at 1484; *Plaster v. United States, supra,* 720 F.2d at 349. *See also In re Extradition of Mahmoud Abed Atta,* 1988 WL 66866 (E.D.N.Y. June 17, 1988) (unreported slip op.) (available on Westlaw, federal database) (holding that constitutional rights in extradition take precedence over treaty terms). However, an American court may not deny extradition because the demanding country's legal system does not comport with American constitutional safeguards. *In re Burt, supra,* 737 F.2d at 1485.

With respect to the first alleged due process violation, McMullen contends that the Government allowed eight years to elapse following its first unsuccessful attempt to extradite him in 1979. Rather than attempting to extradite him during that period, the Government, with knowledge that McMullen was trying to gain asylum, proceeded to amend the extradition treaty so as to reinstitute extradition proceedings. McMullen claims that the Government dragged its feet after winning a final deportation order against him in 1986, making only perfunctory efforts to notify him of the order, and waiting four months to take him into custody and another eight days to arrange his transport to the Republic of Ireland. According to McMullen, the Government procrastinated so as to be able to arrest him minutes before his departure for Ireland on a second extradition warrant, one day after the Supplementary Treaty went into effect.

The Government contends that "[i]t was because of McMullen's own decision to resist deportation that he was still in the United States in December 1986, when the Supplementary Treaty went into effect." The Government claims that there is no evidence that it knew, in 1979, that the Supplementary Treaty was in the offing. Moreover, the Government disputes McMullen's assertion that it deliberately failed to give him actual notice of the pending deportation order, asserting that it notified his attorney and surety in accordance with regulations, and that notice did not reach McMullen personally because he moved without notifying the INS. Finally, the Government points out that a lapse of eight days between McMullen's arrest and his departure is not unreasonable.

Because the Court finds that the Supplementary Treaty may not constitutionally be applied to McMullen, it is unnecessary to decide the question whether the Government's delay in deporting McMullen, or his confession to NSY agents, violated McMullen's due process rights. In addition, these questions could not be decided absent an evidentiary hearing. Should the Government again request McMullen's extradition (under the 1977 Treaty), a hearing would be necessary on these claims.

Finally, McMullen argues that the Government's violation of the principles underlying the prohibition against bills of attainder, *ex post facto* laws, separation of powers, finality of judgments and repose is an abuse of its power and constitutes a separate due process violation. For the reasons set forth in the preceding sections of this opinion, the Court determines that only the bill of attainder clause was violated. In the Court's view, the Government's conduct as a whole does not "shock the conscience" and McMullen's "global" due process claim must, therefore, be rejected.

### CONCLUSION

For the foregoing reasons, the Court finds that the application to McMullen of the Supplementary Treaty violates the constitutional prohibition against bills of attainder. Accordingly, McMullen's petition for a writ of habeas corpus is granted. The other claims raised in the petition are rejected, with the exception of the due process claim which may be raised in the event the Government reinstitutes extradition proceedings against McMullen under the 1977 Treaty.

Settle order on notice.