**Karl LINNAS, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 895, Docket 85–4163.**

United States Court of Appeals, Second Circuit.

Argued March 17, 1986.

Decided May 8, 1986.

---

Ivars Berzins, Babylon, N.Y., for petitioner.

Rudolph W. Giuliani, U.S. Atty. for Southern Dist. of N.Y., New York City, Neal M. Sher, Director Office of Special Investigations, Washington, D.C. (Michael D. Patrick, Sp. Asst. U.S. Atty., Michael Wolf, Deputy Director Office of Special Investigations, Steven E. Obus, Asst. U.S. Atty., Philip L. Sunshine, Aron A. Golberg, Trial Attys., Office of Sp. Investigations, of counsel) for respondent.

Eli M. Rosenbaum, New York City, for The World Jewish Congress, amicus curiae.

Marc D. Stern, Phil Baum, New York City (Samuel Rabinove, Dennis Rapps, of counsel), for American Jewish Congress, amicus curiae.

Before PIERCE, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Petitioner, Karl Linnas, seeks review of an order of the Board of Immigration Appeals ("BIA") determining that petitioner must be deported to the Soviet Union. The BIA ordered Linnas deported under section 241(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a), because of Linnas' active participation in the Nazi persecution of Estonian Jews during World War II. The Soviet Union was designated as the country of deportation pursuant to section 243(a) of the INA, 8 U.S.C. § 1253(a).

Linnas now seeks review of the determination of the BIA on the ground that sections 241(a)(19), 243(h) and 244(e) of the INA, 8 U.S.C. §§ 1251(a)(19), 1253(h), and 1254(e), constitute a bill of attainder in violation of Article I, section 9 of the Constitution of the United States. Alternatively, Linnas argues that his deportation to the Soviet Union would violate his rights to due process and equal protection.

## BACKGROUND

Karl Linnas was born in Estonia in 1919 and entered the United States in 1951 under the auspices of the Displaced Persons Act ("DPA"), Pub.L. No. 80–774, 62 Stat. 1009 (1948), *amended by* Pub.L. No. 81–555, 64 Stat. 219 (1950). In order to gain admittance to the United States as a displaced person, Linnas informed members of the Army Counter Intelligence Corps that he had been a university student during the years 1940 to 1943. In May 1951 Linnas signed an immigration form stating that he had "never advocated or assisted in the persecution of any person because of race, religion or national origin." Upon entering the United States some three months later, Linnas swore to the truth of that statement. The New York State Supreme Court (Suffolk County) admitted Linnas to citizenship in 1960. *See United States v. Linnas,* 527 F.Supp. 426, 436–38 (E.D.N.Y.1981), *aff'd,* 685 F.2d 427 (2d Cir.), *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 146 (1982).

In 1979, the government began an action to revoke Linnas' certificate of naturalization on the grounds that it had been "illegally procured" and "procured by concealment of a material fact or by willful misrepresentation." *See* 8 U.S.C. § 1451(a). Because American citizenship is such a precious possession, denaturalization is not a process which may be lightly accomplished. The government, therefore, had the heavy burden of proving its case against Linnas by clear, unequivocal and convincing evidence which did not leave the issue in doubt. *See Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981).

The evidence presented at Linnas' denaturalization trial before District Judge Jacob Mishler was overwhelming and largely uncontroverted. The government presented eyewitness testimony that Linnas was chief of the Nazi concentration camp in Tartu, Estonia during the time period that Linnas later claimed to have been a university student.

Linnas' duties as a concentration camp chief were such as to offend the decency of any civilized society. Eyewitnesses testified that Linnas supervised the transportation of prisoners from his camp to a nearby antitank ditch. On such occasions innocent Jewish women and children were tied by their hands and brought in their underwear to the edge of the ditch where they were forced to kneel. The guards then opened fire. The ditch became a mass grave.

There was also eyewitness testimony that Linnas on at least one occasion announced his victims' death sentence at the side of the ditch and gave the order to fire. Linnas was also said to have then personally approached the edge of the ditch, and fired into it. Another eyewitness recounted having seen Linnas help direct Jews out of a school and onto a schoolbus. That witness recalled that Linnas helped a small child with a doll onto the bus, and that the doll was later placed in a storage area for

the personal effects of those who had been killed.

The government also introduced documents signed "Karl Linnas, Chief of Concentration Camps," and "Chief of Tartu Concentration Camp." Documentary evidence was also introduced showing that Linnas later joined the 38th Estonian Police Battalion under the command of a senior colonel of the SS and was wounded in battle on August 30, 1944.

From the evidence presented at trial, Judge Mishler concluded that it was "beyond dispute that defendant, Karl Linnas, 'assisted the enemy in persecuting civil populations of countries'.... The inescapable conclusion is that defendant unlawfully entered the country because of the willful misrepresentations he made." *United States v. Linnas,* 527 F.Supp. at 439. That conclusion was affirmed by this court on January 25, 1982. *United States v. Linnas,* 685 F.2d 427 (2d Cir.), *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 146 (1982). The horrific facts of Linnas' past exemplify what this court has described as the clearest case of involvement in persecution: one in which "an individual, often while employed at a concentration camp, has personally arrested, or fired upon detained civilians, or has ordered others to do so." *United States v. Sprogis,* 763 F.2d 115, 122 (2d Cir.1985) (citing *United States v. Linnas,* 527 F.Supp. 426 (E.D.N.Y.1981)).

Following Linnas' denaturalization, the government began deportation proceedings under section 242 of the INA, 8 U.S.C. § 1252. Immigration Judge Howard I. Cohen ruled on May 19, 1983 that Linnas was deportable. Linnas had designated "the free and independent Republic of Estonia" as the country to which he wished to be deported. The independent Republic of Estonia was forcibly incorporated into the Soviet Union following World War II. Linnas apparently intended his designation to mean the office building in New York currently housing the representatives of the independent Republic of Estonia. Immigration Judge Cohen, however, apparently took Linnas' designation to mean that geographic territory historically associated with the Republic of Estonia and currently incorporated in the Soviet Union. In attempting to comply with § 243 of the INA, Immigration Judge Cohen ordered that Linnas be deported from the United States to Estonia, but that if Estonia was unwilling to accept Linnas he was to be deported to the Soviet Union. The Soviet Union, which had tried Linnas in absentia and sentenced him to death for his war crimes, was the only country which had expressed a willingness to accept Linnas. Linnas' request for discretionary relief was denied on the ground that such relief is not available to Nazi persecutors under sections 212(a)(33) and 241(a)(19) of the INA.

Linnas filed a timely appeal to the BIA. On July 31, 1984 the BIA affirmed the decision of the immigration judge except as to the country of deportation. The BIA remanded the case to the immigration judge with instructions to consider the effect of the United States' non-recognition of the Soviet annexation of Estonia and to articulate a statutory basis for the designation of a country of deportation.

On remand, Immigration Judge Cohen reviewed the three step process delineated in § 243(a) of the INA for designation of a country of deportation. Step one, the designation of a country by the deportee, was ruled inapplicable because of Linnas' designation of an office building in New York. Step two, the designation of a country of which the deportee is a citizen, was also held inapplicable. Linnas claimed to be a citizen of the Republic of Estonia, but that country no longer exists as an independent geographic territory. Under step three, the immigration judge may designate deportation to any country which falls within one of seven categories. Immigration Judge Cohen, therefore, considered deportation:

(1) to the country from which such alien last entered the United States;

(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;

(3) to the country in which he was born;

(4) to the country in which the place of his birth is situated at the time he is ordered deported;

(5) to any country in which he resided prior to entering the country from which he entered the United States;

(6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or

(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory.

8 U.S.C. § 1253(a). On April 9, 1985, after considering a letter from the Legal Advisor of the Department of State to the effect that Linnas' deportation to the Soviet Union would not violate the nonrecognition policy, Immigration Judge Cohen held that Linnas should be deported to the Soviet Union under either category (4) or (7). Linnas once again appealed to the BIA, which, in a decision dated October 16, 1985, affirmed the immigration judge's decision based on § 243(a)(7).

Petitioner now seeks review of the BIA's decision on two grounds. First, Linnas contends that sections 241(a)(19), 243(h) and 244(e) of the INA, commonly referred to as the Holtzman amendment, constitute a bill of attainder. Second, Linnas contends that deportation to the Soviet Union would constitute a disguised extradition in violation of his rights to equal protection and due process.

## DISCUSSION

### I. Bill of Attainder

Article I, section 9 of the United States Constitution provides in unequivocal terms that "[n]o Bill of Attainder or ex post facto Law shall be passed." The wisdom of that constitutional command has been held in universally high esteem throughout the history of American jurisprudence. The issue now before this court is whether the legislation in question constitutes a bill of attainder.

A bill of attainder is defined as "a legislative act which inflicts punishment without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315, 66 S.Ct. 1073, 1078, 90 L.Ed. 1252 (1946) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866)). Such bills are condemned in the Constitution largely because they represent a legislative encroachment on powers more properly exercised by the judiciary. A bill of attainder, "assumes, in the language of the textbooks, judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial." *Cummings v. Missouri*, 71 U.S. (4 Wall.) at 323. Historically, bills of attainder carried a death penalty while bills of pains and penalties carried lesser punishments. The bill of attainder clause of the Constitution, however, has been consistently construed to apply to bills of pains and penalties as well as bills carrying a death penalty. *See, e.g., United States v. Brown*, 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1964); *United States v. Lovett*, 328 U.S. at 315, 66 S.Ct. at 1078; *Cummings v. Missouri*, 71 U.S. (4 Wall.) at 323.

Bills of attainder have historically been passed in times of rebellion such as the rebellion of the Earl of Kildare in Great Britain, *see* 28 Hen. VIII., ch. 18, or the Civil War here in the United States. *See generally Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866) (discussing bill of attainder of persons who aided rebellion against United States). The temptation to utilize bills of attainder is especially strong when national security is thought to be threatened. *See generally United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (discussing attainder of government employees thought "subversive" during wartime).

Linnas argues that the Holtzman amendment is a legislative enactment directed at a small group of individuals, Nazi war criminals, for the purpose of punishing those persons without judicial trial. Linnas contends that such a statute constitutes a prohibited bill of attainder. The Holtzman

amendment, in essence, requires the deportation of persons shown to have participated in Nazi persecution during World War II, and eliminates the Attorney General's power to grant such persons discretionary relief. The deportation of Nazi persecutors is required even though the deportee's life or freedom might be threatened as a result.[1]

Applying the elements of a bill of attainder to the Holtzman amendment, it is readily apparent that the challenged provisions are a legislative act. In determining whether that act constitutes punishment the court must consider: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, ——, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 473, 97 S.Ct. 2777, 2805, 53 L.Ed.2d 867 (1977)).

Linnas contends that the Holtzman amendment is within the historical meaning of legislative punishment because deportation is the equivalent of banishment. Banishment is a punishment often associated with bills of attainder. *Nixon v. Administrator of General Services,* 433 U.S. at 474, 97 S.Ct. at 2806; *United States v. Brown,* 381 U.S. at 441, 85 S.Ct. at 1711; *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168 n. 23, 83 S.Ct. 554, 567 n. 23 (1963). Exclusion of a citizen of the United States has at times been held to constitute punishment equivalent to banishment. *See Kennedy v. Mendoza-Martinez,* 372 U.S. at 166–70, 83 S.Ct. at 566–69 (forfeiture of

---

1. The challenged legislative enactment, in full, amends various provisions of the INA to provide:

Deportable aliens—general classes
(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—
    *     *     *     *     *     *
(19) during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
(A) the Nazi government of Germany,
(B) any government in any area occupied by the military forces of the Nazi government of Germany,
(C) any government established with the assistance or cooperation of the Nazi government of Germany, or
(D) any government which was an ally of the Nazi government of Germany,
ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.
8 U.S.C. § 1251(a)(19).
Withholding of deportation or return
(1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;
(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;
(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or
(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.
8 U.S.C. § 1253(h).
Voluntary departure
The Attorney General may, in his discretion, permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (4), (5), (6), (7), (11), (12), (14), (15), (16), (17), (18), or (19) of section 1251(a) of this title (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.
8 U.S.C. § 1254(e).

citizenship and deportation as alien of native-born Americans); *In re Yung Sing Hee*, 36 F. 373 (9th Cir.1888) (exclusion of American citizen of Chinese ancestry under Chinese Labor Exclusion Act). Deportation of noncitizens from the United States, however, has generally been held not to constitute punishment. *See Immigration and Naturalization Service v. Lopez-Mendoza*, 468 U.S. 1032, ——, 104 S.Ct. 3479, 3484, 82 L.Ed.2d 778 (1984); *Mahler v. Eby*, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1923); *Bugajewitz v. Adams*, 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913); *Fong Yue Ting v. United States*, 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893). Linnas is not a citizen of the United States. This case presents little reason for breaking with the traditional rule that deportation, although often severely burdensome, is not punishment. The exclusion of Linnas from ever entering the country would certainly not fit any historical meaning of punishment. To say that his deportation becomes punishment by virtue of his current presence in the United States, a presence fraudulently attained in 1951, would grant Linnas additional protection under the law as a result of his having sworn to untrue statements.

In order to determine whether the Holtzman amendment can be said to further a nonpunitive purpose the court must consider the type and severity of the burdens imposed. It is beyond cavil that deportation generally, and in this case particularly, imposes a severe burden on the deportee. Severity, however, does not in itself make a burden a punishment. *Mahler v. Eby*, 264 U.S. at 39, 44 S.Ct. at 286. Deportation furthers the nonpunitive legislative purpose of protecting the citizenry from persons harmful to the public good. In the case of Nazi persecutors, it borders on sophistry to deny the legitimate legislative purposes of excluding known mass murderers from the United States. It was certainly reasonable for the citizens of the United States, through their elected representatives, to conclude that they did not wish to share their communities with persons who ordered the wholesale extermination of in-

nocent men, women and children. It is also reasonable for the United States, apart from any punitive intent, to wish not to be known in the family of civilized nations as a haven for the refuse of the Nazi abomination.

There is little indication in the legislative record of any Congressional intent to use the Holtzman amendment to punish. Although one Representative did comment that the Holtzman amendment would provide a device for bringing the culpable "to justice," 124 Cong.Rec. H31648 (daily ed. September 26, 1978) (statement of Rep. Gilman), the legislative record as a whole evinces only an intent to exclude from the United States those persons who committed crimes against humanity in the name of Nazism. H.R.Rep. No. 1452, 95th Cong., 2nd Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 4700. Congress' goals in passing the Holtzman amendment appear to have been the need to "put our Government squarely on record as denying sanctuary in the United States to Nazi War criminals," and to "reaffirm our commitment to human rights." 124 Cong.Rec. H31647 (daily ed. September 26, 1978) (statements of Rep. Holtzman).

The Ninth Circuit Court of Appeals faced the issue now before this court in *Artukovic v. Immigration and Naturalization Service* and concluded that the Holtzman amendment is not a bill of attainder because deportation is not punishment. 693 F.2d 894, 897 (1982). We now reach the same conclusion. Because the Holtzman amendment is not punishment and, therefore, not a bill of attainder, we need not consider whether Linnas was deported without a judicial trial. We note, however, that Linnas did in fact receive extensive judicial review.

## II. *Equal Protection and Due Process*

Linnas claims that his deportation to the Soviet Union is in fact a disguised extradition. Linnas was convicted *in absentia* in the Soviet Union and sentenced to death for his war crimes. Linnas contends that the Soviet trial was a sham and that de-

porting him to the Soviet Union is in fact extradition in the absence of an extradition treaty. Linnas argues that to deport him under these circumstances will deprive him of his life without due process.

The irony of Karl Linnas objecting to execution without due process is not lost on this court. The right to due process is, of course, essential to the American system of ordered liberty, and must be extended to all persons in the United States. The fact that Linnas enjoys the right to due process has enabled him to remain in the United States until 1986 even though the government began the denaturalization process in 1979. The considerable length of time that Linnas has been able to remain in the United States after the discovery of his heinous past is a small price to pay for a system of law which separates our government from the government that Linnas served as Chief of the Tartu concentration camp. We now, therefore, examine the merits of the petitioner's due process claim.

■ Linnas' argument centers on the proposition that a noncitizen has a right not to be extradited in the absence of an extradition treaty. We need not address this novel question, however, because no extradition has taken place in this case. Extradition may be applied to either a citizen or noncitizen, whereas deportation applies only to noncitizens such as Linnas. *See* 8 U.S.C. § 1251 *et seq.* Extradition is initiated by a foreign state. While the Soviet Union may have an interest in the trial of Nazi war criminals, the impetus for the denaturalization and removal of Linnas appears to have come from the government of the United States. The legislative history of the Holtzman amendment indicates that the Congress intended to rid this nation of Nazi war criminals, not to court favor with nations having no extradition treaties with the United States. *See* 124 Cong.Rec. H31647–50 (daily ed. September 26, 1978). Ruling this procedure to be an extradition would greatly reduce the ability of this nation to deport those who have committed crimes of moral turpitude in their own countries.

■ In addition, Linnas was given the same opportunity given to any deportee to designate a country to which he wished to be sent. Linnas designated an office building in New York, thus wasting the opportunity to choose a proper place of deportation. The fact that such an opportunity was offered, however, strongly undercuts his contention that his deportation was a disguised attempt to extradite him to the Soviet Union. The record also indicates that the government made at least some attempt to find a country other than the Soviet Union which would accept Linnas. There is no support in the record for Linnas' claim that the government's efforts in this regard were a mere facade. Linnas' own failure to designate a country of deportation lends credence to the immigration judge's finding that no country other than the Soviet Union would accept him. Accordingly, there was no abuse of discretion in designating the Soviet Union as the country of deportation under 8 U.S.C. § 1253(a)(7). That designation did not transform the deportation of Linnas into an extradition.

■ Congress has broad authority over the status of aliens, and there is no substantive due process right not to be deported. *See, e.g., Galvan v. Press,* 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–44, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy,* 342 U.S. 580, 590–91, 72 S.Ct. 512, 519–20, 96 L.Ed. 586 (1952); *Basset v. United States Immigration and Naturalization,* 581 F.2d 1385, 1386–87 (10th Cir.1978). Linnas' procedural due process rights have been meticulously observed throughout the denaturalization and deportation proceedings. As to Linnas' claim that he will be denied due process in the Soviet Union, the jurisdiction of this court obviously does not extend beyond the borders of the United States. It is well established that the federal judiciary may not require that persons removed from the United States be accorded constitutional due process. *See Jhirad v. Ferrandina,* 536 F.2d 478, 484–85 (2d Cir.1976).

We are not, however, deaf to Linnas' protestations concerning the fate which may await him in the Soviet Union. In *Gallina v. Fraser* this court permitted the extradition of a man convicted *in absentia* in a foreign country. 278 F.2d 77, 78–79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). The *Gallina* court hypothesized, however, that there could arise a situation in which the person to be removed from the United States would be subjected to "procedures or punishment so antipathetic to a federal court's sense of decency" as to require judicial intervention. *Id.* at 79. This is not such a case.

The foundation of Linnas' due process argument is an appeal to the court's sense of decency and compassion. Noble words such as "decency" and "compassion" ring hollow when spoken by a man who ordered the extermination of innocent men, women and children kneeling at the edge of a mass grave. Karl Linnas' appeal to humanity, a humanity which he has grossly, callously and monstrously offended, truly offends this court's sense of decency.

Finally, we turn to Linnas' equal protection argument. The essence of that argument appears to be that Congress should not be permitted to treat Nazi war criminals differently from anyone else.

Nazi war criminals are not a class of persons entitled to enhanced scrutiny under the equal protection clause. The legislative system of excluding and deporting such persons will, therefore, "not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Metropolitan Casualty Insurance Company v. Brownell*, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935); *Green v. Board of Elections of City of New York*, 380 F.2d 445, 451 (2d Cir.1967) (Friendly, J.), *cert. denied*, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). The rationality standard is not a difficult standard to meet. In this instance, we are convinced that a rational relationship exists between the deportation of Nazi war criminals and a legit-

imate legislative purpose. Petitioner's equal protection argument is, therefore, without merit.

### CONCLUSION

The petition for review is denied.