**Peter John Gabriel McMULLEN, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**Nos. 653, 654, Dockets 91–2402, 91–2420.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1991.

Decided Jan. 7, 1992.

Diogenes P. Kekatos, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Marla Alhadeff, and Ping C. Moy, Asst. U.S. Attys., on the brief), for appellant.

Ian Weinstein, New York City (Henriette D. Hoffman, on the brief), for appellee.

Before TIMBERS, MINER and ALTIMARI, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant United States (the government) appeals from a judgment entered July 17, 1991, in the Southern District of New York, Robert J. Ward, *District Judge,* granting appellee McMullen's petition for a writ of habeas corpus. The district court held that the Supplementary Extradition Treaty between the United States and the United Kingdom of Great Britain and Northern Ireland, effective December 23, 1986, amending the Extradition Treaty between the same parties effective January

21, 1977, 28 U.S.T. 227, T.I.A.S. No. 8468, is an unlawful bill of attainder (U.S. Const. art. I, § 9, cl. 3) as applied to McMullen. McMullen has been held without bail since December 24, 1986, pending the resolution of this matter.

The sole issue, as stated by the district court, is "whether the Government constitutionally may attempt to extradite McMullen under an amended extradition treaty which removes a defense to extradition successfully asserted by him in a previous extradition proceeding brought pursuant to the prior treaty." *Matter of Extradition of McMullen*, 769 F.Supp. 1278, 1281 (S.D.N.Y.1991).

On appeal, the government contends that the district court erred in holding that the Supplementary Extradition Treaty violates the bill of attainder clause as applied to McMullen. We affirm.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

In 1978, McMullen, a former member of the Provisional Irish Republican Army (PIRA), unlawfully entered the United States by using a false passport issued by the Republic of Ireland in the name Kevin O'Shaughnessy. McMullen claims to have fled to the United States to avoid being executed by the PIRA. He subsequently surrendered to the Bureau of Alcohol, Tobacco and Firearms (ATF), requesting asylum in exchange for information on PIRA gun smuggling and fundraising operations. His request was denied and he was placed under arrest by the Immigration and Naturalization Service (INS). While in custody in the United States, and after being informed of his constitutional rights, McMullen made incriminating statements, including a confession of his participation in the bombing of British army barracks in Belfast, Northern Ireland and in Ripon, Coun-

ty of North Yorkshire, England. On June 20, 1978, a Justice of the Peace in Ripon issued a warrant for his arrest for attempted murder, among other charges.

On behalf of the United Kingdom, the United States filed a formal request for the extradition of McMullen to Great Britain. On May 11, 1979, United States Magistrate Frederick J. Woelflen, of the Northern District of California, denied Great Britain's request to extradite McMullen under a 1977 Treaty between the United States and the United Kingdom. The magistrate held that McMullen satisfied the terms of Article V(1)(c)(i) of the 1977 Treaty which provides that "[e]xtradition shall not be granted if ... the offense for which extradition is requested is regarded by the requested Party as one of a political character...." He further held that McMullen had established that the acts for which his extradition was sought were "political in character." 28 U.S.T. 227, 230, T.I.A.S. No. 8468.

After the magistrate's ruling, the government continued its effort to deport McMullen to the Republic of Ireland. He fought deportation based on his claim of political asylum. After several years of litigation, his asylum claim was defeated. *McMullen v. INS*, 788 F.2d 591, 598 (9 Cir.1986). On September 9, 1986 the government attempted to notify McMullen that he would be deported to the Republic of Ireland on September 22, 1986. Notices were sent to McMullen, his lawyer and the surety on his immigration bond. Since McMullen had moved without notifying the INS, he was not located, arrested and taken into custody for deportation until December 16, 1986. On December 23, 1986, McMullen was transported to New York City for deportation.

The Supplementary Extradition Treaty between the United States and the United Kingdom, amending the 1977 Treaty, also became effective on December 23, 1986. The revisions of the treaty eliminated a large portion of the "political offense" exception that McMullen had successfully invoked in order to evade extradition. Article 1 of the Supplementary Extradition Treaty reads as follows:

"For the purposes of the Extradition Treaty, none of the following shall be regarded as an offense of political character:

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, voluntary manslaughter, and assault causing grievous bodily harm;

(c) kidnapping, abduction, or serious unlawful detention, including taking a hostage;

(d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person;

(e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense."

As a result of these revisions, the actions for which McMullen's extradition is sought arguably no longer satisfied the "political offense" exception. On December 24, 1986, while awaiting deportation to the Republic of Ireland, McMullen was arrested and held for extradition to Great Britain based on the 1978 arrest warrant. His deportation accordingly was cancelled.

On February 11, 1987, on behalf of the United Kingdom, the United States filed a second formal request for McMullen's extradition. He moved to have the extradition request dismissed on the ground that the statute of limitations had expired. In June 1988, however, United States Magistrate Kathleen Roberts, of the Southern District of New York, denied his motion, holding that the statute of limitations was tolled while he was in flight and fighting extradition. *In re McMullen*, 1988 WL 70296 (S.D.N.Y.). Following this decision, on March 6, 1989, McMullen attacked the extradition warrant on constitutional grounds. He argued, *inter alia*, that the Supplementary Extradition Treaty as applied to him is an unlawful bill of attainder. Since she was sitting as an extradition

magistrate pursuant to 18 U.S.C. § 3184 (1988), Magistrate Roberts held *sua sponte* that she lacked jurisdiction to adjudicate his claims. McMullen subsequently filed the petition for a writ of habeas corpus that is the subject of this appeal.

Although a petition for a writ of habeas corpus generally is not heard until after extradition hearings are completed, the district court here agreed, and the parties stipulated, that the district court should decide the issue raised in the habeas petition because its resolution would determine which treaty would apply at McMullen's extradition hearing.

On July 17, 1991, after concluding that the Supplementary Extradition Treaty is an unlawful bill of attainder as applied to McMullen, the district court granted his habeas petition.

We agree with the district court that this matter should be adjudicated on its merits rather than be remanded for an extradition hearing, since we conclude that the Supplementary Extradition Treaty is a bill of attainder as applied to McMullen.

## II.

Article I, § 9, cl. 3 of the Constitution provides that "[n]o Bill of Attainder ... shall be passed." A bill of attainder is " 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.' " *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 846–47 (1984) (quoting *Nixon v. Administrator of General Services*, 433 U.S. 425, 468 (1977)); *see United States v. O'Brien*, 391 U.S. 367, 383 n. 30 (1968). "In forbidding bills of attainder, the draftsmen of the Constitution sought to prohibit the ancient practice of the Parliament in England of punishing without trial 'specifically designated persons or groups.' " *Selective Service System, supra*, 468 U.S. at 847 (quoting *United States v. Brown*, 381 U.S. 437, 447 (1965)). "The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a

narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *Brown, supra,* 381 U.S. at 442. "Just as Art. III confines the Judiciary to the task of adjudicating concrete 'cases or controversies,' so too the Bill of Attainder Clause was found to 'reflect ... the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.'" *Nixon, supra,* 433 U.S. at 469 (quoting *Brown, supra,* 381 U.S. at 445).

■ Turning to the government's contention that the district court erred in holding that the Supplementary Extradition Treaty constitutes an unlawful bill of attainder as applied to McMullen, the "judicial function is 'not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Selective Service System, supra,* 468 U.S. at 850 (quoting *United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 571 (1973)). The district court applied the three prong test set forth in *Selective Service System, supra,* 468 U.S. at 847, for determining whether an enactment is a bill of attainder. It held that the three requisites had been satisfied, since the Supplementary Extradition Treaty: (1) specified the affected parties, (2) imposed punishment, and (3) failed to provide the protection of judicial process. *Id.* at 847; *McMullen, supra,* 769 F.Supp. at 1284. We agree.

(A)

The district court held that the first prong of the bill of attainder test—that the enactment specify the affected persons—was satisfied because the subject legislation targeted McMullen along with two other individuals. In reaching this conclusion, the court referred extensively to the Congressional Record. Specifically, the court placed great weight on comments made by the Supplementary Extradition Treaty's sponsor, Senator Lugar, the Chairman of the Senate Foreign Relations Committee, who stated: "In three cases where [the political offense exception under the 1977 Treaty] has been [invoked], the Federal courts have denied requests by the United Kingdom for the extradition of members of the [PIRA] accused of committing acts of violence." 132 Cong.Rec. 16558 (1986). Senator Lugar also stated: "[I]t was because of these cases that on June 25, 1985, the United States and the United Kingdom signed the Supplementary Extradition [Treaty]. *Its purpose is to reverse the three cases where extradition was denied* and put an end to this development in the law." *Id.* at 16586 (emphasis added).

In determining whether the Senate intended to punish McMullen, the district court also considered the fact that the Senate rejected an amendment, proposed by Senator D'Amato, which would have exempted from extradition those individuals who already have successfully invoked the "political offense" exception. In proposing this amendment, Senator D'Amato recognized that:

"Approving this treaty in its present form may well result in the extradition of certain individuals who American courts have refused to extradite after the most careful consideration

Such a result would be similar to the enactment of a bill of attainder or an ex post facto law in violation of the principle contained in article I, section 9, clause 3,, (sic) of our Constitution...."

*Id.* at 16592.

Furthermore, even if McMullen and the two other specified individuals, Desmond Mackin and Joseph Patrick Thomas Doherty, were not explicitly named in the Congressional Record, a strong argument may be made that the legislation nevertheless targeted them. The decisions which held these three men nonextraditable under the "political offense" exception are reproduced in the Congressional Record. 132 Cong.Rec. 16558–86 (1986). Indeed these three individuals have been the only per-

sons in the last twenty five years to have successfully invoked the 1977 Treaty's political offense exception. *McMullen, supra,* 769 F.Supp. at 1287 n. 10. They clearly are the object of the treaty's retroactive elimination of the "political offense" exception. *Id.; see also Communist Party v. Subversive Activities Control Bd.,* 367 U.S. 1, 86 (1961) ("The singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons."). Accordingly, the district court reached the only logical conclusion that can be drawn from a review of the Congressional Record: that the purpose of the retroactive provision of the Supplementary Extradition Treaty was, in part, to reverse the judicial holding that McMullen was not extraditable. Since we hold that the Supplementary Extradition Treaty targeted McMullen, we turn next to consider whether the second requisite of a bill of attainder is present.

### (B)

■ Under the second prong of the test for bills of attainder—whether the treaty imposed "punishment"—the inquiry is fact specific; each case turns "on its own highly particularized context". *Selective Service, supra,* 468 U.S. at 852 (quoting *Flemming v. Nestor,* 363 U.S. 603, 616 (1960)). We have held that extradition does not constitute criminal punishment. *United States v. Hecht,* 16 F.2d 955, 956 (2 Cir.), *cert. denied,* 273 U.S. 769 (1927). We also have held that deportation does not impose punishment for bill of attainder purposes. *Linnas v. INS,* 790 F.2d 1024, 1030 (2 Cir.), *cert. denied,* 479 U.S. 995 (1986). Despite these holdings, the Supplementary Extradition Treaty, as applied to McMullen, imposes punishment in violation of the bill of attainder clause. Sanctions that ordinarily would not be considered punishment in the penal context may be severe enough to be treated as punishment for bill of attainder purposes. *Brown, supra,* 381 U.S. at 460–61. (Enactment that makes it unlawful for members of the communist party to serve on the executive board of a labor union is a violation of the bill of attainder clause.); *United States v. Lovett,* 328 U.S. 303, 313–14 (1946) (Enactment forbidding payment of wages to certain specified government employees deemed to be subversive is a violation of the bill of attainder clause.).

A unique set of tests, which look beyond ordinary definitions of punishment, have developed to determine whether punishment for bill of attainder purposes has been imposed. To determine whether the enactment imposes punishment, courts should consider: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Service, supra,* 468 U.S. at 852 (quoting *Nixon, supra,* 433 U.S. at 473, 475–76, 478). The district court here held that the latter two of these independent tests—the "functional" and "motivational" tests—support the conclusion that the Supplementary Extradition Treaty imposed a punishment on McMullen. The court held that the third test—the "historic" test—could not be applied properly in the extradition context.

■ Under the "historic" test, courts review the purported punishment and determine whether it imposes "punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon, supra,* 433 U.S. at 475. Traditional "impermissible" punishments include, among others, death sentences, imprisonment, banishment, and "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations." *Id.* at 473–74. McMullen contends that he "would face forced transportation and almost certain incarceration in British prisons, where he will likely face torture and death from either the British, his former compatriots, or both." His contention that such potential perils constitute punishment for bill of attainder purposes is without merit because any punishment that

McMullen may receive in a British prison is not a specific object of the Supplementary Extradition Treaty, but rather the result of the general extradition process. Since we agree with the district court that extradition cannot be analogized to these traditional forms of punishment, we consider next whether the enactment imposes punishment under the two remaining tests.

Under the second test—the "functional" test—we must "analyz[e] whether the [Supplementary Extradition Treaty], viewed in terms of type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes. Where such legitimate purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Nixon, supra,* 433 U.S. at 475–76 (citations omitted); *see also Linnas, supra,* 790 F.2d at 1030 ("Severity ... does not in itself make a burden a punishment."). There appear to be clear nonpunitive purposes in the Supplementary Extradition Treaty, namely to aid in the extradition of terrorists to the United Kingdom, while "preserv[ing] the American tradition" of refusing to extradite political refugees. *McMullen, supra,* 769 F.Supp. at 1288 (quoting 132 Cong.Rec. at 16588 (1986)). The government correctly asserts that:

> "In addition to the goal of combatting international terrorism, other foreign policy concerns motivated the ratification of the Supplementary Treaty. The trend toward the nonextradition of PIRA terrorists in the United States was signalling to other countries, however erroneously, that there was broad support in the United States for acts of terrorism in Northern Ireland. This caused a severe strain in diplomatic relations between the United States and the United Kingdom. In 1986, after the British assisted the United States in its retaliation against Libya for its terrorist acts, President Reagan urged that the Supplementary Treaty be ratified to reciprocate for Great Britain's assistance in the war on terrorism."

(citations omitted); *see also* Scharf, *Foreign Courts on Trial: Why U.S. Courts Should Avoid Applying the Inquiry Provision of the Supplementary U.S.–U.K. Extradition Treaty,* 25 Stanford J. of Int'l L. 257, 263–64 (1988).

We do not dispute that the general purpose of the Supplementary Extradition Treaty was non-punitive. The non-punitive purposes of the treaty, nevertheless, are substantially weaker in view of the retroactive provision that applies to McMullen and the other two targeted individuals. We agree with the district court that the Senate had an ulterior motive in enacting the retroactive provision of the treaty: "as applied to McMullen the Senate purposefully went beyond ... generality to make certain that [McMullen] would be extradited notwithstanding a prior judicial determination of nonextraditability ... [and] this aspect of the Supplementary Treaty is clearly punitive." *McMullen, supra,* 769 F.Supp. at 1289. The district court also held that "[T]he burdens imposed upon McMullen by the Supplementary Treaty far outweigh any arguable non-punitive goals that would be furthered by retroactive application to the three individuals who previously had successfully defended against extradition." *Id.* Although the extradition of McMullen, a confessed terrorist, arguably might strengthen the United States' relations with Great Britain, our aiding Great Britain in reaching its goal of punishing McMullen would be punitive and accordingly inconsistent with the bill of attainder clause. Foreign policy must be conducted within the constraints of the Constitution.

Under the third and final test—the "motivational" test—courts must evaluate whether the "legislative record evinces a congressional intent to punish." *Nixon, supra,* 433 U.S. at 478; *United States v. O'Brien,* 391 U.S. 367, 383 n. 30 (1968). The district court here held that the language in the Congressional Record demonstrates the Senate's desire "to undo the judicial opinion which found his acts exempted as political in nature." *McMullen, supra,* 769 F.Supp. at 1289. We agree with the district court that the "numerous references to McMullen, and the oft-re-

peated purpose of reversing the judicial decision in his earlier extradition proceeding," *id.*, supports this conclusion. Moreover, "the existence of less burdensome alternatives by which that legislature (here Congress) could have achieved its legitimate non-punitive objectives," *Nixon, supra,* 433 U.S. at 482, further demonstrates the Senate's desire to punish McMullen. By rejecting Senator D'Amato's amendment, which would have barred extradition of anyone who already had asserted the political offense defense, the Senate rejected a less burdensome alternative. Indeed, in response to this proposal, Senator Lugar commented that "[t]he effect of this amendment would be to protect two individuals, who are admitted terrorists and who are now in the United States, from further extradition proceedings." 132 Cong.Rec. 16595 (1986). Accordingly, the district court had ample basis for concluding, under the motivational test, that Congress intended to punish McMullen.

### (C)

This brings us to a consideration of whether the district court erred in holding that McMullen satisfied the third prong of the bill of attainder test: whether the enactment failed to provide the protection of judicial process. While recognizing that a judicial role is preserved in the Supplementary Extradition Treaty, the district court held that in the case of McMullen the Senate punished him without the benefit of judicial process. In support of this conclusion, the district court stated:

> "The particular burdens suffered by McMullen—the reversal of a prior finding of nonextraditability, the removal of a defense successfully asserted in a prior proceeding, and almost certain extradition to the United Kingdom—were put in place without a judicial trial. It seems apparent in the instant case 'that Congress was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses.' *Nixon, supra,* 433 U.S. at 479,"

*McMullen, supra,* 769 F.Supp. at 1290.

The government, on the other hand, asserts that the Supplementary Extradition Treaty provides for certain judicial protections that the 1977 Treaty did not address, and that these additional safeguards "belie[ ] the assertion that the Supplementary Treaty is designed to punish McMullen or anyone else." These alleged additional safeguards are included in Article 3(a) of the Supplementary Extradition Treaty which states that:

> "Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained, or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions."

Article 3(a), however, does not appear to provide the same judical safeguards as the "political offense" exception in the 1977 Treaty. Senator Eagleton correctly stated that:

> "It would be a ludicrous reading of the Supplementary Treaty as a whole to conclude that the United States and the United Kingdom went to enormous pains to eliminate the political offense defense … [and] then undid it all in article 3(a) by creating a huge new loophole by which terrorists could seek protracted sanctuary in the United States."

132 Cong.Rec. 16607 (1986). We hold that the Supplementary Extradition Treaty deprived McMullen of his adjudicated rights under the 1977 Treaty and this punishment is not offset by the additional protections of Article 3(a). Moreover, the Senate clearly did not intend for the Supplementary Extradition Treaty to provide any additional protection to McMullen. Rather, the purpose of the treaty, in part, was to reverse the judicial determination that held McMullen nonextraditable. Furthermore, the safeguards of Article 3(a) of the treaty do not appear to be applicable to McMullen

since there has been no evidence presented that Great Britain is trying to "punish him on account of his race, religion, nationality, or political opinions." Accordingly, the district court properly held that the third prong of the bill of attainder test had been satisfied.

### III.

To summarize:

The Supplementary Extradition Treaty is an unlawful bill of attainder as applied to McMullen. First, based upon a review of the Congressional Record, we hold that the enactment targeted McMullen, along with two other individuals. Second, we hold that the Congressional Record further supports the conclusion that the Senate intended to punish McMullen in enacting the retroactive provision of the Supplementary Extradition Treaty. Finally, we hold that the Supplementary Extradition Treaty punished McMullen without the benefit of judicial process.

Affirmed.

MINER, Circuit Judge, dissenting:

I respectfully dissent. It seems to me that no punishment of any kind is imposed by the Supplementary Extradition Treaty and that the Treaty therefore cannot be classified as a bill of attainder. The constitutional provision upon which this case turns prohibits the national legislature from passing any laws, "no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to *inflict punishment* on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946) (emphasis supplied). Requiring a person to submit to a proceeding to determine whether he should be extradited to another country to face charges at a trial which *may result* in punishment can hardly be considered punishment without trial in this country. It is notable that in this case the extradition proceeding would be surrounded by the usual panoply of due process protections, including a hearing, and that in the event of extradition the demanding country would provide a trial (and punishment, if warranted) in the common law tradition from which our own criminal justice system is derived.

My distinguished colleagues apply the prescribed tests to determine whether the Supplementary Treaty punishes Mr. McMullen for bill of attainder purposes and come up with a conclusion somewhat different from mine. We agree that there is no punishment in terms of the "historic" test—"punishment traditionally judged to be prohibited by the Bill of Attainder Clause," *Nixon v. Administrator of General Services*, 433 U.S. 425, 475, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867 (1977). Included in the "traditional" category are the legislative penalties of "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Id.* at 474, 97 S.Ct. at 2806. To this list have been added more modern forms of punishment by legislation: "enactment[s] barring designated individuals ... from participation in specified employments or vocations." *Id. See, e.g., Lovett*, 328 U.S. 303, 66 S.Ct. 1073 (preventing payment of salaries to three federal employees believed to be subversive); *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (denying labor union employment to members of Communist party).

The Treaty does not impose punishment under the "functional" test either. This test calls for an "analy[sis of] whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76, 97 S.Ct. at 2806–07. It is therefore necessary to identify legitimate legislative purposes in order to avoid a conclusion "that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.* at 476, 97 S.Ct. at 2807. The original decisionmaker here, of course, was the President of the United States, who concluded the Supplementary Treaty in the performance of his constitutional treaty making powers. It seems clear that his purpose was to strengthen relations with an important ally and to fur-

ther the United States policy of combatting international terrorism. According to the State Department, the wisdom of narrowing the political offense exception found in the earlier treaty was underscored by recent events involving American victims of terrorist acts. Although the names of McMullen and others were mentioned during the Senate ratification debate, can there be any doubt that the Senate's purpose was the same as the President's?

My colleagues "do not dispute that the general purpose of the Supplementary Extradition Treaty was non-punitive." Slip op. at 767. However, they find that the Senate had an "ulterior motive" to punish McMullen, that the burdens imposed on McMullen outweighed the non-punitive purpose and that "aiding Great Britain in reaching its goal of punishing McMullen would be punitive." *Id.* at 767. It is difficult to understand how the ulterior motive supposedly expressed by the Senate during the ratification debate can be attributed to the President who negotiated the treaty. In any event, it seems certain that the principal purpose of both the President and the Senate was to effect non-punitive foreign relations policy. That an incidental by-product of this purpose ultimately may be the punishment of McMullen should not convert the Treaty into a bill of attainder. It is a simple fact that the Treaty imposes no penalty or punishment but merely provides a mechanism for the transfer of McMullen to Great Britain for trial.

The third test of punishment "inquir[es] whether the legislative record evinces a congressional intent to punish" and therefore is denominated the "motivational" test. *Nixon,* 433 U.S. at 478, 97 S.Ct. at 2808. As to this test, first of all, it seems to me that an inquiry must be made as to Presidential motivation as well as to Senatorial motivation, because the Treaty here is a joint product of the exercise of the constitutional powers of both the executive and legislative branches of government. Certainly, there is no evidence whatsoever that there was any Presidential intent to punish McMullen. Nor can there be discerned a congressional intent to punish in the remarks of but one Senator who dis-

cussed the Treaty's application to McMullen and two others. Even if it were assumed that Senator Lugar spoke for the entire Senate when he said of the Treaty that "[i]ts purpose is to reverse the three cases where extradition was denied," the ratification did not express an intent to *punish* but rather an intent to *extradite* the three individuals.

Although punishment may follow extradition, extradition never has been classified as punishment. *United States v. Hecht,* 16 F.2d 955, 956 (2d Cir.), *cert. denied,* 273 U.S. 769, 47 S.Ct. 572, 71 L.Ed. 883 (1927). The role of the extradition judge is "to determine whether there is competent evidence to justify holding the accused to await trial." *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). At issue in the proceeding "is not punishability but prosecutability." Bassiouni, *International Extradition and World Public Order* 524 (1974). If on a hearing the extradition judge deems the evidence sufficient under the Treaty, he is required to so certify to the Secretary of State, "that a warrant may issue upon the requisition of the proper authorities of [the] foreign government, for the surrender of [the] person, according to the stipulations of the treaty or convention." 18 U.S.C. § 3184. McMullen has not as yet had his extradition hearing under the Supplementary Treaty. There are a number of issues that he is entitled to raise at the hearing, including whether the "request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions." Supplementary Extradition Treaty, Art. 3(a). Even if he is unsuccessful in any of the defenses that he may raise to extradition, McMullen will not be subject to punishment until he is tried and convicted in Great Britain after his surrender. Because this is so, the Treaty cannot be a bill of attainder, and I am compelled to dissent from any opinion that says it is.